STATE v. THOMAS JONES.

(Decided May 15, 1900.)

*Murder in First Degree—Mental Capacity to Premeditate and Deliberate—Evidence Amounting to More than a Scintilla, Conjecture, or Suspicion to be Submitted to the Jury, for them to Weigh and Consider.*

1. In a case of murder, where there is evidence connecting the prisoner with the crime, and the defense is put upon the ground of mental incapacity, which relieved the accused from criminal guilt, or if not entirely, to render him incapable of deliberation and premeditation, and thus relieve him from the charge of murder in the first degree, and the evidence on this point is conflicting, the whole goes to the jury for them to weigh and consider.

2. The evidence submitted by the State must be such as reasonably tends to prove the fact, and must amount to more than a mere scintilla, conjecture, or suspicion, to authorize a finding by the jury.

INDICTMENT for murder of Ella Jones, tried before *Hoke, J.,* at March Term, 1900, of WAKE Superior Court.

There was evidence that the prisoner went to the house of Ella Jones at night, killed her and one of her children with an axe, set fire to the house and burned up the bodies and three others of her children. The defense was made of mental incapacity on the part of the accused to be guilty of crime, especially of the crime of murder in the first degree. The State contended the prisoner had mental capacity to deliberate and premeditate. There was evidence both ways—and the whole was submitted to the jury for them to weigh and consider. They found the prisoner guilty of murder in the first degree. Sentence of death, and appeal to Supreme Court by the prisoner.

The details of the case, including the special instructions asked and refused, appear in the opinion.

*Mr. B. C. Beckwith,* for appellant.
*Attorney-General,* for State.

FURCHES, J.    The prisoner is indicted for the murder of Ella Jones, and plead "not guilty."    While the killing was not formally admitted, it was not denied.    The jury found the prisoner guilty of murder in the first degree.    There are no exceptions to evidence, nor to the conduct of the trial, nor to the charge of the Court, except as appears upon the Court's refusing to give the following special prayers for instruction :

1. That in no aspect of the testimony, and under no reasonable inference that can be drawn from it, is the prisoner guilty of murder in the first degree.

2. That at most the jurors can convict of murder in the second degree.

3. There is no evidence of deliberation and premeditation.

As these are the only exceptions contained in the record, we must take it that the charge of the Court, in all other respects, was correct.    And as the Court could not weigh the evidence and say what parts should be believed and what should not be believed, if there was any evidence that showed or tended to show deliberation and premeditation, if believed, it ought to have been submitted to the jury.    When we say "any evidence," we mean any such evidence as reasonably tends to prove the fact and authorize a finding of the jury. It is sometimes difficult for the Court to determine whether there is such evidence as should be submitted to the jury; and, without undertaking to lay down a rule for the government of courts, we think we may safely say that it should be more than a scintilla—more than a conjecture, more than to

STATE v. JONES.

create a suspicion.   But we do not think this case lies on the border line.

There is evidence that the prisoner had been too intimate with the deceased; that he had gotten a child upon her; that they had trouble about this; that he said to Johnson, a Justice of the Peace, the night before the homicide, that "Ella laid her last child" to him, which was then about one month old, and that they had trouble about it; that he wanted to bring her to his house the next night and have it fixed up; that he was willing to pay her $2 per month; that the next night (the night he proposed to bring the deceased to Johnson's) he went to the house of the deceased, and went in, sat down and talked to the deceased—but how long, does not appear; but it must have been for some considerable time, as the child witness (Laura) testified that his coming in awoke her, but she went to sleep again and was awakened by the scream of her mother, when she saw the prisoner strike her mother with an axe four times; that he then struck her oldest sister with the axe, and the blood flew on her and her younger sister; and that he then struck a match and set the bed on fire, and left.

To corroborate this testimony, tracks were found that had been made by the shoes the prisoner wore.   Blood was found on the two children, who escaped from the burning house, fresh, undried.   Soon after the house was found to be on fire from the alarm given by these two children, and they had related the terrible tragedy and had stated that the prisoner was the author of the crime, some of the persons present went to the prisoner's house for the purpose of arresting him. Upon reaching the house they knocked at the door, and had trouble in arousing the prisoner.   But after so long a time he let them in, when they found a pair of overalls with fresh blood on them, and when this was shown the prisoner he tried

to explain it by saying that it was "chicken blood," that he had killed chickens for Mr. Turner that evening. He also had blood on his hands. After they arrested him and started to the scene of the tragedy, he showed them a paper, so badly written as to be almost unintelligible, purporting to be an account of moneys he had given the deceased, and said that he had kept it so that if anything happened he could show that he had treated Ella right. He was identified on the night of the tragedy as the author of the crime, by the child Laura, and again recognized and pointed out by her on the trial.

The defense was not put upon the ground that the prisoner did not commit the crime, but upon the ground of mental incapacity, which relieved him from criminal guilt; and, if not to entirely relieve him, that it rendered him incapable of exercising "deliberation and premeditation." The prayers for instruction were intended to present this question, and the prisoner produced evidence tending to establish this contention. But the State produced the evidence of a number of witnesses tending to show that he did have sufficient capacity to commit the crime—to meditate and deliberate. In addition to the evidence already stated, the State produced a number of witnesses whose testimony was to the effect that the prisoner had mind sufficient to read, and that he was a local negro preacher. Some of the witnesses testified that his mind was as good as ordinary negroes, and some of them testified that he had good "sense"—as good as they had.

Then, admitting that the prisoner produced some witnesses who testified to the want of sufficient capacity to enable the prisoner to reflect, to meditate and deliberate, still, when the State had produced evidence showing that he had deliberated and meditated about fixing up the trouble with Ella, by what he said to the witness Johnson; that he had tried to explain away the evidence of blood on his hands and clothing, and

produced what purported to be an account with Ella, which he had kept to show that he had treated Ella right—enforced by the evidence of a number of witnesses who testified that his mind was good—made it an issue of fact for the jury which the Judge could not trv, and the prisoner's exceptions were properly refused.

The jury, with all the evidence before them, under proper instructions from the Court (as we must take them to have been proper as they are not given or excepted to) have said that the prisoner is guilty of murder in the first degree. And in saying this, they have said the prisoner did have sufficient mind and capacity to premeditate and to deliberate.

The facts of this tragedy are shocking, when we think of the prisoner's going to the house, in the night time, of a woman with whom he had been having illicit intercourse, and upon who he had gotten a child, taking an axe and killing her and one of her children, setting the house on fire and burning up her and five children, one of them his own offspring— shocking to the utmost degree. If he had capacity to commit this shocking crime, it would seem that he should suffer the extreme penalty of the law. The jury have said he had such capacity, and we have no right to review or reverse their verdict.

There is no error.